**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

|  |  |
|---|---|
| CHRISTINE MARTINDALE,<br><br>Plaintiff,<br><br>v.<br><br>DIGITAL TRENDS LLC d/b/a GROWTH LAB,<br><br>Defendant. | Civil Action No.<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Christine Martindale ("Plaintiff" or "Ms. Martindale") files this Complaint against Defendant Digital Trends LLC d/b/a Growth Lab ("Defendant" or "Growth Lab"). Plaintiff shows the Court as follows:

**NATURE OF THE ACTION**

1.      Plaintiff asserts claims against Growth Lab under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the Pregnancy Discrimination Act of 1978 ("Title VII"), for (i) discrimination on the basis of sex (Count I); discrimination on the basis of pregnancy (Count II); and (ii) retaliation for opposing discrimination against Plaintiff and other employees, and opposing retaliation, as well as for participating in the EEOC process (Count III). Plaintiff seeks declaratory relief, lost wages and benefits, reinstatement and/or front pay and benefits, compensatory damages, punitive damages, interest, and attorneys' fees and costs.

2.      Plaintiff further asserts claims against Growth Lab under the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg, *et seq.* ("PWFA"), for (i) discrimination through failure to accommodate Plaintiff's pregnancy (Count IV); and (ii) retaliation (Count V).  Plaintiff seeks

declaratory relief, lost wages and benefits, reinstatement and/or front pay and benefits, compensatory damages, punitive damages, interest, and attorneys' fees and costs.

3.      Finally, Plaintiff asserts a retaliation claim under the Providing Urgent Maternal Protections for Nursing Mothers Act, 29 U.S.C. §§ 207, 215, 216 ("PUMP Act") (Count VI). Plaintiff seeks declaratory relief, lost wages and benefits, reinstatement and/or front pay and benefits, liquidated damages, compensatory damages, interest, and attorneys' fees and costs.

## JURISDICTION AND VENUE

4.      This Court has federal-question jurisdiction over Plaintiff's claims, pursuant to 28 U.S.C. §§ 1331 and 1343.

5.      Pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 2000e-5(f)(3), and Local Rule 3.4, venue is proper in this Court because the unlawful employment practices described herein were primarily committed within the Macon Division of the Middle District of Georgia, where Plaintiff resides and where she worked for Defendant.

## PARTIES

6.      Plaintiff is a resident of the State of Georgia and submits herself to the jurisdiction of this Court.

7.      Plaintiff was Defendant's "employee" within the meaning of Title VII at all relevant times.

8.      Defendant is a private employer based in Kansas City, Missouri, with employees who work remotely.  Defendant advertises that it provides search engine optimization ("SEO") and Google Ads marketing services to lawyers.

9.      Defendant was an "employer" within the definition of Title VII, 42 U.S.C. § 2000e(b), at all relevant times.

2

10.     Defendant was a "covered entity" within the definition of the PWFA, 42 U.S.C. § 2000gg(2)(B), at all relevant times.

11.     Defendant was an employer within the definition of the Fair Labor Standards Act ("FLSA"), as amended by the PUMP Act, 29 U.S.C. § 203(d), at all relevant times.

12.     Defendant employed Plaintiff from May 2021 to May 12, 2025, although Plaintiff was misclassified as an independent contractor from approximately May 2021 to January 2022.

## ADMINISTRATIVE EXHAUSTION

13.      Plaintiff has satisfied all administrative prerequisites for bringing her Title VII claims in this Court.

14.     On September 4, 2024, Plaintiff filed her first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") (Charge No. 410-2024-13336), in which she asserted claims for sex discrimination and retaliation.

15.     On January 7, 2025, Plaintiff filed an Amended Charge of Discrimination, maintaining Charge No. 410-2025-13336, in which she asserted claims for sex discrimination and retaliation.

16.     On June 11, 2025, following Defendant's termination of her employment, and termination of her husband's employment, Plaintiff filed a Second Amended Charge of Discrimination with the same Charge No. 410-2025-13336.  The EEOC assigned that Charge a new number, Charge No. 425-2025-01459.   In Plaintiff's Second Amended Charge of Discrimination, she asserted claims for sex discrimination, pregnancy discrimination (under Title VII and the PWFA), failure to accommodate, and retaliation.

17.     On June 25, 2025, the EEOC issued a Notice of Right to Sue ("NRTS") on Plaintiff's EEOC Charge No. 410-2024-13336.

18.     On September 11, 2025, the EEOC issued a Notice of Right to Sue ("NRTS") on Plaintiff's EEOC Charge No. 425-2025-01459.

19.     Plaintiff files her Complaint within ninety (90) days of her receipt of the NRTS on both Charge No. 410-2024-13336 and Charge No. 425-2025-01459.

## STATEMENT OF FACTS

20.     Ms. Martindale is a 40-year-old woman.

21.     Ms. Martindale started working with Growth Lab as an independent contractor in March 2021, initially working on a landing page design project.

22.     In May 2021, Ms. Martindale became an Account Manager for search engine optimization ("SEO").

23.     In June 2021, Ms. Martindale's title was changed to Director of Accounts.

24.     Although Ms. Martindale was an employee of Growth Lab under all relevant analyses, Growth Lab misclassified her as an independent contractor until January 2022.

25.     In approximately August-September 2021, Paul Poremski joined Growth Lab.  He was placed under Ms. Martindale's leadership.  However, he was paid substantially more than Ms. Martindale.

26.     Throughout Ms. Martindale's employment with Growth Lab, she observed that men were systemically paid more than women, and men were also held to lesser standards than women.

27.     Ms. Martindale officially became an employee in January 2022.

28.     Ms. Martindale's husband, Andrew Martindale, also worked for Growth Lab.

29.     On or about January 26, 2023, during an "all hands" conference, Chase Spencer, who had not yet joined Growth Lab, but soon would, asked Ms. Martindale and her husband

whether they had sex in the pyramids when they were discussing their trip to Egypt. Growth Lab's CEO and Owner, Will Palmer, who is personal friends with Mr. Spencer, laughed and did not correct this behavior.

30.    On or about September 5, 2023, in preparation for a meeting with RizeUp, Mr. Spencer singled Ms. Martindale out and warned her that, in order to be included, she had to accept they would use vulgar and/or unprofessional language because, "that's just how those guys are." It was implied that, if Ms. Martindale was unwilling to accept such behavior, she would not be included in these meetings going forward.

31.    On or about September 29, 2023, Ms. Martindale had a meeting with Mr. Palmer about the treatment and disrespect she was receiving as a woman from the male members of Growth Lab's pay per click ("PPC") team. They discussed how Mr. Palmer tried to manage the situation by making Ms. Martindale "less visual" in management. Mr. Palmer acknowledged that this was unfair and said he could see how Ms. Martindale viewed it as a punishment for her simply because the male members of the PPC did not want to receive direction from a woman.

32.    On or about October 22, 2023, Ms. Martindale was on a leadership call. Mr. Spencer asked Mr. Palmer, "Did you tell them our Q4 leadership slogan?" Mr. Palmer responded, "Do you mean 'balls deep'"? Mr. Spencer responded, "Yeah man! Balls deep," which was followed by laughter. Mr. Palmer said to me, "Sorry Christine, but you're surrounded by guys."

33.    On or about November 20, 2023, Ms. Martindale had a call with Mr. Palmer, in which Ms. Martindale stated that she was having a problem getting her work recognized and publicly supported, and the focus was instead about how Mr. Spencer felt about her and her interactions. When she tried to explain her perspective, Mr. Palmer raised his voice and said heatedly, "It is defensive, Christine. It is emotional and defensive, and now you are being

defensive about your own defensiveness." Ms. Martindale never witnessed Mr. Palmer speak to any male members of the leadership team, or any male employees generally, with a similar tone.

34. In January 2024, due to her objectively successful performance, Growth Lab promoted Ms. Martindale to Chief Operating Officer ("COO").

35. On or about January 8, 2024, Mr. Palmer ended Growth Lab's in-person leadership meeting early so the male leaders could go golfing. Neither Ms. Martindale nor any other women were invited.

36. On or about May 2, 2024, Growth Lab offered a position on the SEO team to a male outside hire. The candidate was not more qualified for the role than the female employees who had already been in the SEO department. Nevertheless, the male new hire was offered a substantially higher salary than the female had been making. This was consistent with the common pay disparity between men and women at the company.

37. On or about May 15, 2024, Ms. Martindale reported to Mr. Palmer and Travis Brown (Chief People Officer) concerns that Mary Franklin and Autumn Parish had regarding Mr. Spencer's treatment of Ms. Franklin.

38. On or about May 22, 2024, Ms. Martindale notified Mr. Palmer that she was pregnant.

39. On or about June 28, 2024, Mr. Spencer stated expressly that he wanted to assign an employee to a new client because of the employee's race and gender. Ms. Martindale immediately opposed this.

40. On or about July 22, 2024, Ms. Martindale raised concerns regarding Paul Poremski being deceptive and insubordinate to her. Mr. Palmer had previously conceded that Mr. Poremski likely treated Ms. Martindale disrespectfully because she is a woman.

6

41.     On or about July 24, 2024, Ms. Martindale complained to Mr. Brown, another personal friend of Mr. Palmer's, regarding the discriminatory experiences she was having as a female leader at the company, to include being talked over in meetings and having credit for her ideas stolen.

42.     On or about July 25, 2024, the day after Ms. Martindale's discrimination complaint to Mr. Brown, Mr. Palmer told Ms. Martindale that he was unwilling to discipline Mr. Poremski in any way.  Mr. Palmer told Ms. Martindale that, in order to be a successful leader with Growth Lab, she had to find a way to work with men like Mr. Poremski, who treated her disrespectfully, without complaint or need to see the behavior corrected or addressed.  Mr. Palmer went on to blame Ms. Martindale for the problems she was experiencing with certain male employees.  Mr. Palmer told Ms. Martindale that she was having problems with certain members of the team because she had "a problem working with men," and not because there was a pattern of sexist behavior.  Ms. Martindale asked for an example, and Mr. Palmer provided a recent instance in which Ms. Martindale had to discipline a male employee, a decision that Mr. Palmer himself approved.

43.     On September 6, 2024, in a meeting with Mr. Palmer, Mr. Spencer, and Mr. Brown, Ms. Martindale was told that she was being demoted from COO to a newly-created strategist position, in which she would no longer directly supervise anyone.  As Growth Lab's leadership knew, Ms. Martindale was pregnant at the time.  Mr. Palmer mentioned her impending maternity leave (anticipated for November 2024) but said it had nothing to do with the decision.

44.     On or about September 6, 2024, Growth Lab presented Ms. Martindale with a proposed employment agreement that, among other things, required her to waive the right to a jury

trial in the event of a dispute, and contained a non-disparagement provision.  Ms. Martindale did not sign this agreement.

45.    On September 9, 2024, Ms. Martindale filed her first EEOC Charge opposing discrimination and retaliation in violation of Title VII.  The same day, Ms. Martindale notified Mr. Palmer of the filing of the EEOC Charge.

46.    On November 11, 2024, Ms. Martindale give birth to her child, and went on maternity leave.

47.    On December 19, 2024, while Ms. Martindale was on maternity leave, Growth Lab demanded that she sign another agreement that required that she submit all of her claims against Growth Lab to arbitration.  Mr. Palmer threatened to terminate Ms. Martindale if she did not sign it.  The agreement also decreased her overall compensation.

48.    On January 7, 2025, Ms. Martindale filed her first Amended EEOC Charge and continued to oppose discrimination and retaliation in violation of Title VII.

49.    After substantial back-and-forth with Mr. Palmer, and continued threats of termination if she did not sign the agreement, in January 2025, while still on maternity leave, Ms. Martindale signed a revised version of the agreement that provided that the arbitration provision "shall not extend to claims that Employee has asserted against the Company in her EEOC charge (Charge No. 410-2024-13336)."

50.    On February 14, 2025, Ms. Martindale had a "welcome back" meeting with Mr. Palmer to discuss her return to work following maternity leave.  During this meeting, Ms. Martindale discussed her pumping schedule, and specifically stated that she would need to take time every three hours to do so.  In that February 14, 2025 meeting, Mr. Palmer told Ms. Martindale

that she would not need to explain further, represented that they were very supportive of nursing/pumping mothers, and Ms. Martindale should just take the time as needed.

51.    On either March 3 or 4, 2025, Mr. Palmer sent Ms. Martindale a calendar invite for another meeting to tell her the specifics of her new role and client load.  Ms. Martindale politely reached out to Mr. Palmer on Microsoft Teams to explain that she had a conflict at that time (as part of her nursing schedule) and asked for Mr. Palmer to reschedule that meeting.  This request was both consistent with their February 14, 2025 conversation and Growth Lab's stated flex-time policies. However, Mr. Palmer responded angrily, implied that Ms. Martindale was not acting in good faith, and demanded to see the flex-time policy to which Ms. Martindale was adhering.  Mr. Palmer then ultimately did change the meeting time.

52.    On March 5, 2025, Ms. Martindale complained of retaliation and sent Mr. Palmer an email detailing instances of the retaliatory treatment to which she was being subjected since her return to work from maternity leave and filing of the EEOC Charges.  Ms. Martindale specifically complained that Mr. Palmer was further demoting her, excluding her from discourse regarding her new client load, interfering with and shaming her for her use of flex-time in comparison to others on the team, which she was using to pump, and treating her differently than another employee regarding a scheduling request, refusing Ms. Martindale's while granting an identical request made earlier in the day made by a male employee.

53.    On March 6, 2025, Palmer responded to Ms. Martindale's March 5, 2025 protected activity with a hostile email that attacked Ms. Martindale, and made implied termination threats, such as: "The company is moving forward, and you need to decide if you are willing to be part of that or not."

54.    On March 10, 2025, Ms. Martindale replied to Mr. Palmer's March 6, 2025 email, stating that, while she disagreed with many of his statements, she felt that she could not respond to defend herself from them without further aggression or threats of termination.  Ms. Martindale also reminded Mr. Palmer of her need to pump and gave resources for him to understand her rights as a nursing mother, including links to guidance on Title VII, PWFA, and the PUMP Act.

55.    On March 12, 2025, Mr. Palmer responded by accusing Ms. Martindale of creating a false narrative.  He claimed that "at no point" did Ms. Martindale communicate to leadership that the personal time she was taking according to Growth Lab's flex-time policies was to pump breast milk.  This was false.  Ms. Martindale expressly communicated her pumping needs to Mr. Palmer during the back-to-work meeting on February 14, 2025.

56.    On March 13, 2025, Ms. Martindale replied to Mr. Palmer and stated that his assertions about her not communicating her pumping needs were incorrect.  Mr. Palmer did not respond to this email.

57.    On March 27, 2025, Ms. Martindale followed up regarding her March 13, 2025 email reporting discrimination and retaliation and raised additional concerns regarding Mr. Palmer and Autumn Parish collaborating to create an atmosphere of retaliation, including by way of a Microsoft Teams conversation Ms. Martindale had with Ms. Parish.

58.    On March 28, 2025, Mr. Palmer responded to Ms. Martindale's March 27, 2025 email, referring to her complaints of intimidation and hostility as "inappropriate and disruptive," and reframing his and Ms. Parish's behavior as "constructive criticism"  In that March 28, 2025 email, Mr. Palmer also claimed that Ms. Martindale had a "victim mentality" and asked that she review a document called "the Accountability Ladder" (attached hereto as Exhibit A) and watch a video regarding same.  Under threat of further "corrective actions," Mr. Palmer told Ms.

10

Martindale that she was expected to "internalize its principles" which Ms. Martindale understood to mean that she was expected to raise no further complaints about discrimination, retaliation, or hostile work environment, especially considering that Mr. Palmer continued to assert that her complaints were not raised "in good faith."

59.    On March 31, 2025, Ms. Martindale responded to Palmer's email and, *inter alia*, clarified again that her complaints and concerns were being raised in good faith, reiterating her request that he stop making these unfounded accusations against her.  She said, in part,

> You appear to be suggesting that the only way for me to 'take responsibility' is for me to be silent about the retaliatory treatment that I have experienced and agree with your mischaracterization of my intentions and interactions with other employees. Not only is this is a blatant attempt to use your power in this situation to silence me and force my capitulation in an apparent effort to weaken my EEOC complaint against the company, it is setting an appalling precedent for what retaliation other employees can expect should they ever have complaints or concerns about discrimination or a hostile work environment that you disagree with.

60.    That same day, on March 31, 2025, Ms. Martindale saw a doctor regarding the stress and emotional anguish she was experiencing at work. The doctor provided her with a note putting her on sick leave for the remainder of the week.

61.    On April 9, 2025, Ms. Martindale followed up on her March 31, 2025 email, pointing out a lack of constructive guidance or leadership regarding Mr. Palmer's expectations for her in her new role.

62.    On April 10, 2025, Mr. Palmer responded to Ms. Martindale's April 9, 2025 email and provided her with a list of actions he claimed she needed to take, including initiate requests for clarification as soon as uncertainties arise, receive feedback constructively, demonstrate an openness to input and ideas that may differ from her own, and own areas of improvement. All of

11

the feedback provided under these specific categories in some way took issue with Ms. Martindale's complaints of discrimination and retaliation.

63.     On April 11, 2025, Mr. Palmer messaged a group of Growth Lab employees who were working on a specific client account for the Skillern Firm.  In that message, Mr. Palmer explained that he had been discussing strategy with Matt Skillern and had decided to move them to the "new process," which involved making a different person/team responsible for the decisions regarding content and SEO strategy.  Pursuant to that new process, Ms. Martindale was no longer the decisionmaker regarding SEO or content strategy for the account.

64.     On April 28, 2025, in the normal course of business with the Skillern Firm, Ms. Martindale explained the changes to the process, including that she was no longer the decisionmaker regarding SEO or content strategy for the account. At the time, she believed that she was reiterating what had already been described by Mr. Palmer to the client.

65.     The point of contact for the Skillern Firm, Anne Avilez, questioned why this change had been made and Ms. Martindale explained that it was a decision that Mr. Skillern and Mr. Palmer had come to together.  This was consistent with what Mr. Palmer had told Ms. Martindale and she did not know at the time that it was inaccurate.  After this exchange, Ms. Parish reached out and told Ms. Martindale explicitly that she was not to explain to clients that she was not in charge of their strategy.

66.     On April 30, 2025, Ms. Martindale was copied on an email conversation with Mr. Skillern and Mr. Palmer, in which Mr. Palmer told Mr. Skillern to "ignore the thread below," which was the conversation between Ms. Avilez and Ms. Martindale wherein Ms. Martindale explained the changes in the content and SEO strategy.  Ms. Martindale replied to Growth Lab's internal team only and stated that she was confused and asked for clarification on what had been

explained to the client.  Mr. Palmer then responded by blaming Ms. Martindale for the confusion and expressing frustration that this is happening during his vacation while he was trying to "connect with [his] wife" and said that that someone will let Ms. Martindale know "what the plan with you and the firm is moving forward soon."

67.     That same day, April 30, 2025, Ms. Martindale was put on an unexpected and immediate leave of absence, allegedly "due to the ongoing communication issues and the disruption caused to both internal team members and Skillern Firm[.]"  This leave was originally one week, and she was set to return on Wednesday, May 7, 2025.  However, on Monday, May 5, 2025, the leave was extended to Monday, May 12, 2025, and Ms. Martindale was told that she would be having a mandatory meeting upon her return.

68.     On May 12, 2025, Growth Lab terminated Ms. Martindale.

69.     Growth Lab claims that Ms. Martindale's termination was part of a "lay off."

70.     Minutes after Ms. Martindale's termination, Growth Lab terminated her husband, Andrew Martindale.

71.     Growth Lab claimed that Mr. Martindale's termination was also part of a "lay off."

72.     Growth Lab terminated Ms. Martindale because was a female employee who repeatedly engaged in protected activity under Title VII, the PWFA, and the PUMP Act.

73.     Growth Lab's proffered reasons for demoting and terminating Ms. Martindale are pretextual.

74.     Growth Lab terminated Mr. Martindale because he is married to Ms. Martindale, who repeatedly engaged in protected activity under Title VII, the PWFA, and the PUMP Act.

75.     Growth Lab's violations of Title VII were done with malice and/or with reckless indifference to Plaintiff's federally protected rights.

76.     Growth Lab's violations of the PWFA were done with malice and/or with reckless indifference to Plaintiff's federally protected rights.

77.     Growth Lab's violations of the PUMP Act were willful and not in good faith.

## COUNT I
### Sex Discrimination in Violation of Title VII

78.     Ms. Martindale was a female employee of Growth Lab.

79.     Growth Lab subjected Ms. Martindale and other female employees to different terms and conditions of employment.  Male employees were paid more than female employees in equivalent positions and, in at least one instance, a male employee who reported to Ms. Martindale received higher compensation than she did.

80.     Growth Lab permitted Ms. Martindale's male subordinates to be insubordinate and disrespectful to her, which was never tolerated for male executives.  When Ms. Martindale brought up these issues, Mr. Palmer blamed her for them.

81.     Growth Lab's CEO, Mr. Palmer, spoke to Ms. Martindale in an aggressive and demeaning manner, which Ms. Martindale never observed him exhibit towards male employees.

82.     Growth Lab subjected Ms. Martindale to sexually demeaning comments and jokes.

83.     Growth Lab tolerated a work environment wherein Ms. Martindale was talked over in meetings, and a male employee took credit for her work.

84.     When Ms. Martindale opposed this discrimination on the basis of sex, Growth Lab demoted her, reducing her compensation, removing all direct reports, and ensuring that she no longer had access to information demonstrating Growth Lab's discriminatory pay practices.

85.     Growth Lab subjected Ms. Martindale to discriminatory terms and conditions of employment because of her sex, and demoted her because of her sex, in violation of Title VII.

14

86.     As a direct and proximate result of Growth Lab's violations of Title VII, Ms. Martindale has incurred lost wages and benefits, and has suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

87.     Ms. Martindale seeks all available relief under Title VII, including lost wages and benefits, compensatory damages, punitive damages, interest, and reasonable attorneys' fees and costs.

## COUNT II
## Pregnancy Discrimination in Violation of Title VII

88.     On May 22, 2024, Ms. Martindale notified Growth Lab that she was pregnant.

89.     Ms. Martindale had her baby on November 11, 2025.

90.     At all relevant times, Growth Lab was an "employer" within the meaning of Title VII.

91.     Growth Lab discriminated against Ms. Martindale because of, and based on, her pregnancy, childbirth and/or related medical condition.

92.     When Ms. Martindale was on maternity leave, Growth Lab forced her to sign an agreement that, among other things, diminished her overall compensation and, as originally formulated, required that she submit all of her claims against the company to arbitration.

93.     When Ms. Martindale returned from maternity leave, Growth Lab applied different terms and conditions to Ms. Martindale, to include criticizing her for scheduling time to express breast milk while other employees were not similarly criticized for scheduling breaks pursuant to the same policy, refusing to grant a scheduling request while granting the same request submitted by a male employee, and threatening her with a further demotion.

15

94.     As a direct and proximate result of Growth Lab's violations of Title VII, Ms. Martindale has incurred lost wages and benefits, and has suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

95.     Ms. Martindale seeks all available relief under Title VII, including lost wages and benefits, compensatory damages, punitive damages, interest, and reasonable attorneys' fees and costs.

**COUNT III**
**Retaliation in Violation of the Title VII**

96.     Ms. Martindale engaged in protected activity under Title VII by repeatedly opposing the discrimination and retaliation she was experiencing, including in internal complaints on June 28, 2024, July 22, 2024, July 24, 2024, March 5, 2025, March 10, 2025, March 27, 2025, and March 31, 2025.  Ms. Martindale further engaged in protected activity by filing an EEOC Charge on September 9, 2024, and an Amended EEOC Charge on January 7, 2025.

97.     Growth Lab retaliated against Ms. Martindale by (a) subjecting her to ongoing hostility, ridicule, and condescension; (b) reducing her overall compensation; (c) discriminatorily applying polices and rules to her; (d) failing to provide her guidance in her new demoted role; (e) routinely threatening her with termination when she complained about the retaliation; and, ultimately (f) terminating her employment; and (g) terminating her husband's employment.

98.     As a direct and proximate result of Growth Lab's violations of Title VII, Ms. Martindale has incurred lost wages and benefits, and has suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

99.     Ms. Martindale seeks all available relief under Title VII, including lost wages and benefits, compensatory damages, punitive damages, interest, and reasonable attorneys' fees and costs.

**COUNT IV**
**Discrimination by Failure to Accommodate in Violation of the PWFA**

100.    At all relevant times, Growth Lab was a "covered entity" under the PWFA.

101.    At all times, Ms. Martindale was an employee under the PWFA.

102.    Growth Lab discriminated against Ms. Martindale by failing to accommodate her in violation of the PWFA when it interfered with her scheduling and taking breaks to pump, shaming her for doing so, and impliedly threatening her with termination.

103.    As a direct and proximate result of Growth Lab's violations of the PWFA, Ms. Martindale has suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

104.    Ms. Martindale seeks all available relief under the PWFA, including compensatory damages, punitive damages, interest, and reasonable attorneys' fees and costs.

**COUNT V**
**Retaliation in Violation of the PWFA**

105.    Ms. Martindale engaged in protected activity under the PWFA, including by (1) taking maternity leave; (2) requesting and scheduling time to pump; and (3) formally requesting that Growth Lab comply with the PWFA, including a March 10, 2025 email in which Ms. Martindale stated, *inter alia*, "I am formally requesting an accommodation to pump breast milk pursuant to the PUMP for Nursing Mothers Act ("PUMP"), and the Pregnant Workers Fairness Act ("PWFA"), and specifically that I be provided adequate time to pump throughout the day."

106.    Growth Lab retaliated against Ms. Martindale in violation of the PWFA by (a) reducing her overall compensation; (b) discriminatorily applying policies and rules to her; (c) routinely threatening her with termination when she complained about the retaliation; and, ultimately (d) terminating her employment; and (e) terminating her husband's employment.

17

107.   As a direct and proximate result of Growth Lab's violations of the PWFA, Ms. Martindale has incurred lost wages and benefits, and has suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

108.   Ms. Martindale seeks all available relief under the PWFA, including lost wages and benefits, compensatory damages, punitive damages, interest, and reasonable attorneys' fees and costs.

**COUNT VI**
**Retaliation in Violation of the PUMP Act**

109.   At all relevant times, Growth Lab was an "employer" within the meaning of the FLSA, as amended by the PUMP Act.

110.   At all relevant times, Ms. Martindale was an "employee" within the meaning of the FLSA, as amended by the PUMP Act.

111.   Ms. Martindale engaged in protected activity under the PUMP Act, including by (1) requesting and scheduling time to pump; and (2) formally requesting that Growth Lab comply with the PUMP Act, including a March 10, 2025 email in which Ms. Martindale stated, *inter alia*, "I am formally requesting an accommodation to pump breast milk pursuant to the PUMP for Nursing Mothers Act ("PUMP"), and the Pregnant Workers Fairness Act ("PWFA"), and specifically that I be provided adequate time to pump throughout the day."

112.   Growth Lab retaliated against Ms. Martindale in violation of the PUMP Act by (a) discriminatorily applying polices and rules to her; (b) threatening her with termination when she complained about the retaliation; and, ultimately (c) terminating her employment; and (d) terminating her husband's employment.

113.    As a direct and proximate result of Growth Lab's violations of the PUMP Act, Ms. Martindale has incurred lost wages and benefits, and has suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

114.    Ms. Martindale seeks all available relief under the PUMP Act, including lost wages and benefits, liquidated damages, compensatory damages, interest, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a **TRIAL BY JURY** and the following relief:

a)    A declaratory judgment that Defendant's practices complained of herein violated Title VII, the PWFA and the PUMP Act;

b)    Lost wages and benefits;

c)    An award of compensatory damages;

d)    An award of punitive damages;

e)    An award of liquidated damages;

f)    Prejudgment and post-judgment interest;

g)    Reinstatement and/or front pay and benefits;

h)    Costs and expenses of this action, including reasonable attorneys' and expert fees; and

i)    Such other and further relief as this Court deems just and proper.

Respectfully submitted, this 11th day of September 2025.

/s/ Justin M. Scott
Justin M. Scott
Georgia Bar No. 557463
Grace A. Starling
Georgia Bar No. 464958

19

RADFORD SCOTT LLP
125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Telephone: 404.400.3600
Facsimile: 478.575.2590
jscott@radfordscott.com
gstarling@radfordscott.com

*Counsel for Plaintiff*